IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Earl Allen, : 
               Petitioner : 
                : 
       v. : No. 1460 C.D. 2017
                : Submitted: March 23, 2018
Unemployment Compensation : 
Board of Review, : 
               Respondent : 

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
             HONORABLE MICHAEL WOJCIK, Judge
             HONORABLE DAN PELLEGRINI, Senior Judge

OPINION
BY PRESIDENT JUDGE LEAVITT               FILED: July 12, 2018

Earl Allen (Claimant), *pro se*, petitions for review of an adjudication of the Unemployment Compensation Board of Review (Board) denying his claim for benefits under Section 402(e) of the Unemployment Compensation Law (Law), 43 P.S. §802(e).[1] In doing so, the Board affirmed the Referee's decision that Claimant committed disqualifying willful misconduct by confronting and threatening a co-worker. Finding no error by the Board, we affirm.

Claimant worked full-time for CP Converters, Inc. (Employer) as a quality control technician, from July 23, 2016, until he was discharged on March 16, 2017, for threatening another employee. Claimant filed a claim for unemployment compensation benefits, which the Service Center denied under Section 402(e) of the Law. Certified Record (C.R.) Item No. 5, at 1. Claimant appealed, and the Referee conducted a telephonic hearing on May 10, 2017.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e), which states, in relevant part, that "[a]n employe shall be ineligible for compensation for any week ... [i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct...."

At the hearing, Employer presented the testimony of Marvin Isaac, a second shift supervisor, who testified as follows. He stated that on March 13, 2017, Claimant approached him after work in the company parking lot and stated that he knew "it would come to this" between the two men. Notes of Testimony, 5/10/2017, at 4 (N.T.__). Claimant then said the two should "go around back and handle this now." *Id.* Isaac replied that he was not going to participate, got in his vehicle and drove away. Claimant drove after him into downtown York, pulled up next to Isaac's car and told him to pull over. Claimant also called Isaac's cell phone and left the following voicemail:

> [Y]ou think that funny ... you little bitch! Give me a tour of the city gigglin[g]. You're a fuckin' nut and a pussy, now what! You gonna go tell the police you bitch ass nigger, now what! Pull the fuck over, you know where I'm at. And I hope you play with them fuckin' hammers pussy.

C.R. Item No. 3, at 7B.[2]

In response, Isaac sent Claimant the following text message: "[y]ou might as well find you another job dumb ass Nigga I promise you this ain't what you want [y]ou are a funny nut ass ole head! Your boss will know how you acting like a teenager I got more to lose than your dumb ass." C.R. Item No. 10, Claimant Exhibit 1. Isaac reported the incident to Chad Brenneman, Employer's Director of Human Resources.

Brenneman testified that upon learning of the incident, he told Claimant not to come into work while Employer investigated. Brenneman then asked Claimant to come in for a meeting with Brenneman, Susan Craley, Claimant's supervisor, and Chris Higgs, the Plant Manager. At that meeting, Claimant

---

[2] Isaac explained that the term "hammer" refers to a gun.

2

acknowledged his discussion with Isaac in the parking lot and that the two drove around the city. Claimant shared the above-quoted text message Isaac had sent him. Claimant also stated that Isaac had left him a similar voicemail message, but Claimant could not produce it. Brenneman testified that Employer discharged Claimant because of his threatening behavior toward Isaac.

Claimant testified about his long-standing personality conflicts with Isaac. Then, on March 13, 2017, he learned from a co-worker that Isaac was spreading rumors about Claimant. When Claimant asked Isaac about these rumors, Isaac responded, "I'm tired of this shit. Let's go talk about this," and told Claimant to follow him in his car. N.T. 9. Claimant became confused about the drive so he called Isaac. When Isaac did not answer, Claimant left the above-quoted voicemail. Isaac responded with his own offensive text message, also quoted above.

Based on his conversation with Higgs, Claimant believed that both he and Isaac would learn about any disciplinary measures on the first work day after the incident. Instead, only Claimant was told to stay home. Claimant challenged this disparate treatment and suggested that Employer's decision to discharge him was influenced by hearing Isaac's version of the events first.

The Referee concluded that Claimant's confrontation with Isaac constituted willful misconduct. The Referee found that the electronic communications between the two men corroborated Isaac's account that he was trying to avoid a physical confrontation with Claimant. They did not support Claimant's version that Isaac told Claimant to follow him. Noting that Employer's rules clearly prohibited "[t]he use of profane, abusive, or threatening language towards fellow employees, customers, [and] guests," the Referee held that

3

Claimant's initiation of the confrontation and threats to Isaac constituted willful misconduct.  Referee's Decision at 3.

Claimant appealed to the Board, arguing that both he and Isaac used inappropriate language but only Claimant suffered a consequence.  Claimant argued that because the confrontation happened after work hours and the messages were not exchanged on Employer's premises, there was no violation of Employer's work rules.  Finally, Claimant argued that Employer did not uniformly enforce its work rule.

The Board affirmed the Referee.  In doing so, the Board adopted the Referee's findings, conclusions and credibility determinations.  The Board explained:

> Although the claimant asserts on appeal that his supervisor did not get fired even though his supervisor sent text messages to the claimant using profanity with racial slurs, the claimant was the instigator of the altercation and therefore, they were not similarly situated.  Commonwealth Court has held that "the mere fact that one employee is discharged for willful misconduct and others are not discharged for the same conduct does not establish disparate treatment." *American Racing Equipment, Inc. v.* [*Unemployment Compensation Board of Review*], 601 A.2d 480, 483 (Pa. Cmwlth. 1991).  Therefore, the claimant has not shown sufficient evidence of disparate treatment of the employer's policy to negate his willful misconduct.
>
> Notably, the interaction between the claimant and his supervisor began during work and continued after work hours.  As such, the incident was sufficiently connected with his employment.

Board Adjudication at 1.  Claimant petitioned for this Court's review.

4

On appeal,[3] Claimant argues that the Board's conclusion that he committed disqualifying willful misconduct is not supported by substantial evidence. He also challenges the fairness and accuracy of Employer's investigation because Isaac arrived at work early and spent four hours with Employer; Claimant was allotted 20 minutes to present his side of the story. Finally, Claimant argues that Employer did not uniformly enforce its prohibition against threatening and inappropriate language, rendering the rule a nullity.

Claimant first argues that the Board's findings of fact are not supported by substantial evidence, which is "relevant evidence upon which a reasonable mind could base a conclusion." *Stage Road Poultry Catchers v. Department of Labor and Industry, Office of Unemployment Compensation, Tax Services*, 34 A.3d 876, 885 (Pa. Cmwlth. 2011). In reviewing a substantial evidence argument, this Court examines the evidence in the light most favorable to the prevailing party and gives that party the benefit of any inferences that can be logically drawn from the evidence. *Id.* "Findings made by the Board are conclusive and binding on appeal if the record, when examined as a whole, contains substantial evidence to support those findings." *Kelly v. Unemployment Compensation Board of Review*, 776 A.2d 331, 336 (Pa. Cmwlth. 2001).

The Referee found that Isaac's version of the altercation was supported by his testimony and by the transcript of the voicemail Claimant left on Isaac's phone. Claimant theorizes that Employer's investigation was improperly influenced by Isaac, who presented his version of events first. However, it is not disputed that

---

[3] Our scope of review is to determine whether constitutional rights were violated, whether an error of law was committed or whether necessary findings of fact are supported by substantial competent evidence. *Seton Company v. Unemployment Compensation Board of Review*, 663 A.2d 296, 298 n.2 (Pa. Cmwlth. 1995).

Employer heard both sides. The Board credited Isaac's testimony over Claimant's contradictory testimony, and it is well-settled that "[q]uestions of credibility and the resolution of evidentiary conflicts are within the sound discretion of the Board, and are not subject to re-evaluation on judicial review." *Miller v. Unemployment Compensation Board of Review*, 405 A.2d 1034, 1036 (Pa. Cmwlth. 1979). The Board's findings that Claimant used abusive language and made threats in contravention of Employer's work rule are supported by substantial evidence, and we reject Claimant's argument to the contrary.

Claimant next argues that the Board erred in concluding that he engaged in willful misconduct. Even so, Claimant asserts that he had good cause for the conduct for which he was discharged.

Section 402 of the Law establishes eligibility standards for unemployment compensation. Section 402(e) states:

> An employe shall be ineligible for compensation for any week--
>
> * * *
>
> (e) In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work, irrespective of whether or not such work is "employment" as defined in this act[.]

43 P.S. §802(e). As this Court has explained:

> There are four categories of activity that can constitute willful misconduct: (1) the wanton or willful disregard of the employer's interests; (2) the deliberate violation of the employer's rules; (3) the disregard of the standards of behavior which an employer can rightfully expect from an employee; and (4) negligence demonstrating an intentional disregard of the employer's interests or the employee's duties and obligations to the employer.

6

*Kelly v. Unemployment Compensation Board of Review*, 747 A.2d 436, 439 (Pa. Cmwlth. 2000). Whether the conduct for which an employee has been discharged constitutes willful misconduct is a question of law. *Id.* at 438. The employer bears the burden of proving willful misconduct. Where the employer meets that burden, it then becomes incumbent upon the claimant to prove that his actions did not constitute willful misconduct or that he had good cause, *i.e.*, his actions were justified and reasonable under the circumstances. *Id.* at 439.

Here, Employer presented a copy of its Employee Acknowledgment Form, signed by Claimant, which established the work rules for all employees. According to Employer's policy, "[t]he use of profane, abusive, or threatening language toward fellow employees, customers, [and] guests" constitutes grounds for disciplinary action, up to and including immediate discharge. C.R. Item No. 3, at 7C-7D. The Board found that Claimant violated this work rule by initiating the confrontation with Isaac and making threats, and it concluded that the violation constituted willful misconduct.

Accordingly, the burden shifted to Claimant to show good cause for his conduct. Claimant argues that Isaac and Isaac's supervisor created a hostile work environment by engaging in "bad work place behavior" and using "threatening language" toward Claimant. Claimant's Brief at 8. Claimant testified that Isaac spread rumors about him, but Claimant did not offer specific examples of Isaac's alleged "bad work place behavior" and "threatening language" to support his hostile work environment argument. Even if Isaac had contributed to a hostile work environment, it did not give Claimant good cause to initiate a confrontation with Isaac in the parking lot and threaten physical violence. Simply, Claimant did not prove that he had good cause for violating Employer's policy.

7

Finally, we consider Claimant's disparate treatment argument. "Disparate treatment is an affirmative defense by which a claimant who has engaged in willful misconduct may still receive benefits...." *Geisinger Health Plan v. Unemployment Compensation Board of Review*, 964 A.2d 970, 974 (Pa. Cmwlth. 2009).[4] In this respect, "disparate treatment" has different contours.

In the seminal case, *Woodson v. Unemployment Compensation Board of Review*, 336 A.2d 867 (Pa. 1975), the employer discharged the claimant (and others) for excessive absenteeism. Our Supreme Court held that the employer did not prove willful misconduct because its work rule against excessive absenteeism had been enforced in a racially discriminatory manner. It held:

> [W]e cannot sanction the Bureau's acceptance of an employer's standard which expects certain conduct from black employees, but not from white employees. The use of such a standard to determine unemployment benefits constitutes state action based on the racially discriminating policies of an employer. This is prohibited.

*Id*. at 869.[5]

---

[4] An employee seeking to prove disparate treatment must make an initial showing that:

> (1) the employer discharged claimant, but did not discharge other employees who engaged in similar conduct; (2) the claimant was similarly situated to the other employees who were not discharged; and (3) the employer discharged the claimant based upon an improper criterion.

*Geisinger*, 964 A.2d at 974.

[5] The dissent in *Woodson* agreed that "the law does not sanction discharge of employees under the guise of 'willful misconduct,' if the employer applies a racial double standard in making such discharges." *Woodson*, 336 A.2d at 869 (Pomeroy, J., dissenting). However, the dissent would have remanded the matter to the Board, which had made no findings on the claimant's assertion of racial discrimination. The dissent criticized the majority for making the critical findings of fact thereby turning the Supreme Court into a "super Unemployment Compensation Board." *Id*. at 870.

Thereafter, in *Bays v. Unemployment Compensation Board of Review*, 437 A.2d 72 (Pa. Cmwlth. 1981), this Court considered the eligibility of a claimant who (along with others) was discharged for his role in an illegal work stoppage. Not all participants were discharged. Some employees received warnings, and others were suspended. This Court agreed with the Board that the discharged claimants did not show disparate treatment because the conduct of each employee differed. Some were ringleaders while others were reluctant participants. All participated in the work stoppage in some way, but they behaved differently.

In *American Racing Equipment, Inc. v. Unemployment Compensation Board of Review*, 601 A.2d 480, 483 (Pa. Cmwlth. 1991), this Court stated that "the mere fact that one employee is discharged for willful misconduct and others are not discharged for the same conduct does not establish disparate treatment. *Bays v. Unemployment Compensation Board of Review*, [437 A.2d 72 (Pa. Cmwlth. 1981)]." The issue in *American Racing* was insubordination, and the claimant acknowledged that he refused to follow a directive. The claimant contended, however, that he was the victim of disparate treatment because the employer should have issued this directive to another employee. The claimant did not contend that insubordination was usually tolerated by his employer. We rejected the claimant's disparate treatment argument.

It has been long held that an employer's inconsistent enforcement of a work rule constitutes a form of disparate treatment. In *City of Beaver Falls v. Unemployment Compensation Board of Review*, 441 A.2d 510 (Pa. Cmwlth. 1982), this Court considered the city's inconsistent enforcement of its requirement that city employees had to live in the city. Drawing on *Woodson*, 336 A.2d 867, we explained the need for consistent enforcement of a work rule as follows:

9

The [Supreme] Court held that a standard of conduct which an employer may expect of an employee must be equally applied to both blacks and whites. We believe that such a consideration is equally applicable where racial discrimination is not involved.

*Beaver Falls*, 441 A.2d at 512. Accordingly, we concluded that an employer's "inconsistent enforcement of its [work rule] did not establish such a standard of conduct with which it could reasonably expect its employees to comply." *Id.* Stated otherwise, a written work rule that is not enforced uniformly is no more than a piece of paper.

Here, the Board stated that "Commonwealth Court has *held* that 'the mere fact that one employee is discharged for willful misconduct and others are not discharged for the same conduct does not establish disparate treatment.'" Board Adjudication at 1 (quoting *American Racing*, 601 A.2d at 483) (emphasis added). In actuality, this quoted sentence was not the holding in *American Racing* but, rather, a characterization of the *Bays* decision. In *Bays*, there was a common thread to the willful misconduct of multiple employees, *i.e.*, participation in a work stoppage. However, the employees acted differently during that work stoppage and, thus, were disciplined differently. This single sentence from *American Racing*, which overstates the principle established in *Bays*, is *obiter dictum*. The Board has erroneously made it the holding of *American Racing*, and it is not.[6]

An employer cannot pursue haphazard enforcement of its work rule and expect that rule to be dispositive of a claimant's eligibility. "[I]nconsistent enforcement" of a work rule does "not establish such a standard of conduct with which [an employer] could reasonably expect its employees to comply." *Beaver*

---

[6] The holding in *American Racing* was, simply, that refusal to follow a directive constitutes willful misconduct, and there was no suggestion that insubordination was generally tolerated by the employer.

10

*Falls*, 441 A.2d at 512. To be sure, an employer may change its enforcement policy from one of a lax posture to one of zero tolerance, but it must warn employees of the new strict enforcement policy. *Id*. at 512 n.3.

An unemployment compensation proceeding is not for redressing employee workplace grievances but, rather, for determining eligibility for unemployment compensation. Accordingly, in *American Racing*, we rejected the claimant's challenge to the employer's decision to issue a directive to the claimant and not to another employee. The focus of any unemployment case involving willful misconduct is upon the employee, not the employer. *Bays*, 437 A.2d 72. Inconsistent enforcement of a work rule defeats the existence of the work rule. *Beaver Falls*, 441 A.2d 510. However, it is not the Board's province to usurp the management prerogative of the employer, which must decide on a case-by-case basis what discipline to impose when a work rule infraction occurs. *Geisinger*, 964 A.2d 970 (holding that a discharge for multiple infractions of a computer policy did not render the work rule a nullity because other employees, with far fewer violations, were not discharged).

With these principles in mind, we turn to Claimant's charge that he has been the victim of disparate treatment. Claimant wants to focus on Employer. He complains, for example, about the quality of Employer's investigation of the incident, but this is outside the ambit of an unemployment compensation hearing. Claimant acknowledges that both he and Isaac exchanged "rude words" but complains that only Claimant was disciplined. Claimant's Brief at 11. The record demonstrates that both Claimant and Isaac used "profane" and "abusive" language.[7]

---

[7] Claimant points out, correctly, that the electronic exchanges did not take place during work hours or on Employer's premises. Whether they violated Employer's work rule is problematic. However, Claimant's threatening confrontation in Employer's parking lot did violate the work rule, as found by the Referee.

11

However, the Board found that Claimant did more. He used "threatening" language, which included a reference to a weapon, and he was the one who was found to have instigated the altercation in the parking lot. Simply, the conduct of Isaac and Claimant was not the same and, thus, Claimant did not make the case that Employer's work rule was not uniformly enforced.[8]

For all of the foregoing reasons, we affirm the Board's decision.

_____
MARY HANNAH LEAVITT, President Judge

---

[8] This Court's recent decision in *Kraft v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 1125 C.D. 2017, filed June 13, 2018), is also instructive. *See* Commonwealth Court Internal Operating Procedure 414(a), 210 Pa. Code §69.414(a) (unreported memorandum decisions may be cited for persuasive value). In *Kraft*, the claimant was dismissed, *inter alia*, for making a racial comment, purportedly in jest. The claimant asserted that the employer's work rule against the use of racial slurs or negative stereotyping and demeaning jokes was not uniformly enforced. However, the racial comments made by other workers were not made directly to another employee, as was the case with the claimant's racial comment. As in *Geisinger* and *Bays*, there existed a common thread to the conduct in question, but the particulars were different.

12

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Earl Allen,                              :
            Petitioner              :
                             :
            v.                            : No. 1460 C.D. 2017
                             :
Unemployment Compensation                :
Board of Review,                         :
            Respondent              :

# **O R D E R**

AND NOW, this 12th day of July, 2018, the order of the Unemployment Compensation Board of Review dated August 16, 2017, in the above-captioned matter is AFFIRMED.

_____
MARY HANNAH LEAVITT, President Judge