IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Shannon Cummins,                             :
                Petitioner            :
                                     :
                v.                          :  No. 1944 C.D. 2017
                                     :  No. 1945 C.D. 2017
Unemployment Compensation Board      :  Submitted: December 14, 2018
of Review,                                   :
                Respondent            :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT               FILED: April 12, 2019

These consolidated appeals concern Shannon Cummins' (Claimant) claim for benefits under the Unemployment Compensation Law (Law).[1] At Docket No. 1944 C.D. 2017, Claimant petitions for this Court's review of the Unemployment Compensation Board of Review's (Board) adjudication denying her claim under Section 402(e) of the Law, 43 P.S. §802(e).[2] In doing so, the Board affirmed the Referee's decision that Claimant committed disqualifying willful misconduct by threatening a co-worker. We affirm the Board.[3]

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §§751-918.10.

[2] Section 402(e) of the Law states, in relevant part, that "[a]n employe shall be ineligible for compensation for any week ... [i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct...." 43 P.S. §802(e).

[3] The appeal at Docket No. 1945 C.D. 2017 concerns Claimant's request to backdate her claims for weeks ending June 17, 2017, through July 8, 2017, which the Board denied under Section 401(c) of the Law, 43 P.S. §801(c), and 34 Pa. Code §65.43a. In her Statement of the Case, Claimant writes that she "made a mistake of waiting 2 weeks [] to file[]" because she was confused by the correspondence. Claimant Brief at 7. Claimant does not otherwise address the denial of her request to backdate her claim in her brief to this Court. Claimant's failure to adequately address

Claimant worked full-time for Force Industries, Inc. (Employer) as an Assistant Manager of the Plant Office from March 30, 2014, until she was discharged on June 8, 2017, for threatening another employee. Claimant filed a claim for unemployment compensation benefits, which the UC Service Center denied under authority of Section 402(e) of the Law. Certified Record (C.R.) Item No. 6, at 1. Claimant appealed, and the Referee conducted a hearing on September 28, 2017.

At the hearing, Employer presented the testimony of its President, James McBride. He stated that Employer's Plant Manager, Kenny McBrearty, gave him a screenshot of a Facebook post made by Claimant on June 6, 2017, several hours after she and McBrearty had a confrontation at work. Claimant's original post read as follows:

> Today, a man put his hands on me. It's then when [you] realize how weak they are that they can't pick on someone of their own kind. I learned willpower, self[-]restraint and gained dignity. I wonder how he feels now.

Employer Exhibit 3 at 1-2; C.R. Item No. 10, at 23-24. In a comment to her post, Claimant wrote "I would [have] sliced his throat open if it didn't happen at work. And had no remorse." Employer Exhibit 3 at 2; C.R. Item No. 10, at 24. McBride testified that "everybody at work had copies" of the post. Notes of Testimony, 9/28/2017, at 5 (N.T. ___).

McBride testified that during a phone call with Claimant on June 8, 2017, he informed her that "[she] can't make a threat like that, that [she's] going to

---

the issue in her brief leads to our conclusion that the issue has been abandoned and therefore waived. We affirm the Board's decision at 1945 C.D. 2017.

slit somebody's throat and not have any remorse about it and expect to have a job."

N.T. 5. McBride discharged Claimant during this phone call.

McBride testified that on the following day, he called the police to the plant. According to the police report, McBrearty

> confirmed he took a hold of [Claimant's] arm to move her into the office, after yelling at her about not wearing safety goggles. McBrearty apparently had asked [Claimant] several times prior to wear safety goggles while in the shop. The company had recently received a $15,000 fine from [the Occupational Safety and Health Administration], for no safety goggles[.] McBrearty admitted to becoming agitated with [Claimant], because this [had] been an [ongoing] issue.

N.T., Employer Exhibit 2 at 6; C.R. Item No. 10, at 21. Three other employees who witnessed the confrontation confirmed McBrearty's account to the police. These employees stated that McBrearty did not push Claimant but escorted her from the shop floor. One employee stated that Claimant had been warned multiple times about her failure to wear safety goggles.

In her testimony, Claimant offered a different version of her June 6, 2017, confrontation with McBrearty. She testified as follows:

> [Claimant:] Because he-he came out of the office through an area in the plant where you can go so far and you don't have to wear safety goggles and I was in that area talking to another employee and he came out of his office, let's just say would be that door and this is the plant, stormed open the door and came right over to me, came through two other employees and put his hand-hand up underneath my arms like this and shoved me backwards to where I had...-then he let go and I walked myself into the office. And that's when I got....
>
> [Referee:] Okay, for the record the Claimant demonstrated putting her ar...-her hand around her bicep. Go ahead.

3

[Claimant:] And then when I walked into the office I gathered my things and I left and I told the other girl that works in the office with me, there's one thing that I won't put up with and that's a man putting his hands on me and she said, you shouldn't have to. So, I left and I told [McBride] I left, and that was on June 6th.

N.T. 9.

Claimant acknowledged that she wrote the Facebook post later that evening because "[she] was mad that [McBrearty] still had a job and [she was] sitting at home and nothing was being done." N.T. 10. Claimant testified that she was upset because McBrearty's conduct violated Employer's policy prohibiting harassment, but he faced no discipline. Claimant added:

There's nothing, like, I would have been I guess arrested or fined or something had this been a threat, but as far as the threat goes on the Facebook, it-it wasn't a threat. It just said a man put his hands on me today and I was able to show, like you know, basically how strong I could be, and then had it been ...-had we been alone I could have sliced his throat. Yes, cause a knife is the only weapon I carry. I don't carry guns. I don't carry any of that, it's...-that's my only way to protect myself and my children, I'm a single mom. So, I said, you know had it been different and we'd been alone and there wasn't three other men working right there that he barreled through to get to me then yeah, it could have been...-it could've been different and that's what I would've done, but it [in] no way said, Kenny I'm coming after you, watch your back. [It] [i]n no way said, you know, [inaudible] street. It didn't mention the name of the company, it didn't mention Ken-Kenny at all and it didn't presently say I'm coming after you. It just said things could have been different had we been alone.

N.T. 10-11. Claimant testified that she was running late to work on June 8, 2017, and called to inform Employer of her tardiness. It was during this phone call that McBride fired her.

4

After Claimant testified, McBride took the stand again. He explained that it took a couple days for him to make a determination about Claimant's employment because he wanted to "sort this out and see what [was] going on." N.T. 12. He explained that initially he was only told about the content of the Facebook post and sought an actual copy of the post to confirm its authenticity. McBride stated that he was concerned that McBrearty's son had seen the post. Once he obtained the copy, he decided to discharge Claimant.

The Referee concluded that Claimant's statement about slicing her co-worker's throat constituted willful misconduct. Although Claimant's Facebook post did not mention McBrearty or Employer by name, anyone who read the post, including Employer and Claimant's co-workers, understood that Claimant referred to McBrearty. The Referee rejected Claimant's argument that her statement was not a threat, finding that it was "specific and overtly menacing." Referee Decision at 2. He concluded that because Claimant's statement "would be disruptive and cause discord amongst knowing individuals at the workplace," it constituted willful misconduct. Referee Decision at 2.

Claimant appealed to the Board. She contested the Referee's finding that her Facebook post constituted a direct threat to a co-worker. She also complained that Employer never told her why she was fired. Claimant asserted that her discharge was based on hearsay and that Employer failed to properly investigate the incident. Claimant argued that Employer's handbook does not state a policy that Employer can discharge employees based upon the content of their social media posts.

The Board adopted the Referee's findings and conclusions. The Board noted Claimant's admission

5

that she does carry a knife for self-defense and that if co-workers were not present she may have used it against [McBrearty,] who grabbed her by the arm. The Claimant's Facebook post in which she stated "I would have sliced his throat open if it didn't happen at work. And had no remorse," constituted a true threat.

Board Adjudication at 1. Claimant petitioned for this Court's review.

On appeal,[4] Claimant argues that the Board erred in finding her Facebook post was a direct threat. Claimant also argues that the Board erred in holding that she committed disqualifying willful misconduct because she did not post the comment while at work.

We first address Claimant's argument that her Facebook comment did not constitute a threat.[5] Claimant maintains that her comment, which she made in the subjunctive, described how she would have handled the situation had it occurred under different circumstances, *i.e.*, she would have used her knife "as self[-]defense if it was in a different location or just her and him." Claimant Brief at 11. The Board counters that Claimant's statement constituted a threat because it expressed a desire to inflict harm upon a particular co-worker. Those who read the Facebook post took it seriously and feared for McBrearty's safety.

A "threat" is defined as a communication conveying an "intent to inflict loss or pain on another." BLACK'S LAW DICTIONARY 1708 (10th ed. 2014). Claimant's post stated that she "would [have] sliced his throat open if [the incident

---

[4] Our review determines "whether constitutional rights were violated, [whether] an error of law was committed or whether necessary findings of fact are supported by substantial competent evidence." *Seton Company v. Unemployment Compensation Board of Review*, 663 A.2d 296, 298 n.2 (Pa. Cmwlth. 1995).

[5] We note that Claimant has not developed her arguments with any citation to pertinent legal authority. *See Rapid Pallet v. Unemployment Compensation Board of Review*, 707 A.2d 636, 638 (Pa. Cmwlth. 1998) (undeveloped arguments without citation to legal authority will not be considered).

with McBrearty] didn't happen at work." Employer Exhibit 3 at 2; C.R. Item No. 10, at 24. This satisfies the definition of "threat."

Claimant's assertion that the statement was not a threat because she did not use definitive language is not persuasive. Our precedent teaches otherwise.

In *Sheets v. Unemployment Compensation Board of Review*, 708 A.2d 884, 884-85 (Pa. Cmwlth. 1998), a claimant was discharged for stating he "may as well shoot [his two co-workers] and get it over with." The Board found this language to constitute a threat, even though the claimant used the word "may" and not the more definitive "will." This Court affirmed.

In *Johns v. Unemployment Compensation Board of Review*, 87 A.3d 1006 (Pa. Cmwlth. 2014), the claimant suffered from emotional disability. The employer hired an outside agency to serve as the claimant's advocate. During a meeting with his supervisor, the claimant stated that he was upset with an employee of the advocate agency, and that "if he saw her, he would likely hurt her." *Id.* at 1009. On appeal to this Court, the claimant argued that he lacked intent to harm and that his phrasing was conditional in nature. This Court rejected that argument, stating that "'[h]urt' is clearly a form of physical harm[]" and that the claimant's communication constituted an expression of intent to inflict harm. *Id.* at 1011.

Consistent with *Sheets* and *Johns*, we reject Claimant's argument that she did not make a threat because her statement was conditioned on the incident hypothetically happening outside of work and outside the presence of coworkers. *Johns*, 87 A.3d 1006. Likewise, Claimant's use of the subjunctive "would have" does not reduce the severity of her words. *See Sheets*, 708 A.2d at 884. Further, although Claimant was expressing her present feelings about a past incident, her words expressed an intent to cause physical harm.

7

In her next issue, Claimant argues that the Board erred in concluding that she engaged in disqualifying willful misconduct because she was not at work when she posted the statement to Facebook. Section 402(e) of the Law states:

> An employe shall be ineligible for compensation for any week--
>
> * * *
>
> (e) In which his unemployment is due to his discharge or temporary suspension from work *for willful misconduct connected with his work*, irrespective of whether or not such work is "employment" as defined in this act[.]

43 P.S. §802(e) (emphasis added). This Court has explained that

> [t]here are four categories of activity that can constitute willful misconduct: (1) the wanton or willful disregard of the employer's interests; (2) the deliberate violation of the employer's rules; (3) the disregard of the standards of behavior which an employer can rightfully expect from an employee; and (4) negligence demonstrating an intentional disregard of the employer's interests or the employee's duties and obligations to the employer.

*Kelly v. Unemployment Compensation Board of Review*, 747 A.2d 436, 439 (Pa. Cmwlth. 2000) (citation omitted). Whether the conduct for which an employee has been discharged constitutes willful misconduct is a question of law, and the employer bears the burden of proof. *Id.* at 438. Where the employer meets that burden, it then becomes the claimant's burden to prove that he had good cause, *i.e.*, his actions were justified and reasonable under the circumstances. *Id*. at 438-39.

This Court's precedent establishes that a threat of violence or harm to a supervisor or co-worker disregards the standard of behavior an employer can rightfully expect of an employee. *Sheets*, 708 A.2d at 885; *Andrews v. Unemployment Compensation Board of Review*, 633 A.2d 1261, 1263 (Pa. Cmwlth.

8

1993). In the present case, the Board found that Claimant's statements were threatening, specific and overtly menacing.

Even though Claimant did not make the threatening statement at work, there is no requirement that an employee's misconduct must occur on the employer's premises or while the employee is on duty to be considered work-related. *Caruso v. Unemployment Compensation Board of Review*, 551 A.2d 1167 (Pa. Cmwlth. 1988). In *Caruso*, the claimant threw an object through the screen and glass front doors of his supervisor's home at 4:00 a.m., awakening his supervisor's wife and children. The claimant admitted that he went to the house at 4:00 a.m. knowing that the supervisor was working out-of-state at a plant embroiled in a labor dispute. The claimant also admitted that he told the wife's brother-in-law, also an employee, that if he was a "company man" a similar incident could occur at his house. *Id.* at 1170. The claimant's actions arose as a result of the labor dispute at work, and as such, the conduct was sufficiently connected with his work so as to make him ineligible for benefits under Section 402(e) of the Law.

Similarly, here, Claimant made her threatening statement on Facebook as a result of her confrontation with McBrearty at work. At the hearing, Claimant testified that she wrote the post later that evening because "[she] was mad that [McBrearty] still had a job and [she's] sitting at home and nothing was being done." N.T. 10. Claimant's conduct was sufficiently connected to her work to constitute willful misconduct.

Once Employer met its burden of proving willful misconduct, the burden shifted to Claimant to show good cause for her conduct. Claimant in this case has not put forward any argument that she had good cause for her conduct.

9

Therefore, the Board did not err in holding that Claimant committed disqualifying willful misconduct.

For all of the foregoing reasons, we affirm the Board's decision to deny Claimant's claim under Section 402(e) of the Law, 43 P.S. §802(e). Because Claimant has waived the backdating issue, we affirm the Board's decision at 1945 C.D. 2017.

_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Shannon Cummins,                          :
                    Petitioner            :
                                          :
          v.                              :    No. 1944 C.D. 2017
                                          :    No. 1945 C.D. 2017
Unemployment Compensation Board           :
of Review,                                :
                    Respondent            :

# **O R D E R**

AND NOW, this 12th day of April, 2019, the orders of the Unemployment Compensation Board of Review dated November 29, 2017, in the appeals docketed at No. 1944 C.D. 2017 and No. 1945 C.D. 2017 are AFFIRMED.

_____
MARY HANNAH LEAVITT, President Judge