# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jay Kruise, : 
               Petitioner : 
                : 
     v. : No. 1715 C.D. 2019
                : SUBMITTED: June 12, 2020
Unemployment Compensation : 
Board of Review, : 
               Respondent : 

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                             FILED: July 29, 2020

Jay Kruise (Claimant) petitions for review, *pro se*, of the October 7, 2019 Order of the Unemployment Compensation Board of Review (Board) affirming the decision of a Referee to deny Claimant unemployment compensation (UC) benefits. The Board concluded that Claimant was ineligible for UC benefits under Section 402(e) of the Unemployment Compensation Law (Law)[1] because he was discharged for willful misconduct. We affirm the Board's Order.

## Background

Claimant worked for Tobyhanna Army Depot (Employer) from September 2007 through November 29, 2018, most recently as a full-time information technology specialist. Bd.'s Finding of Fact (F.F.) No. 1. On November 29, 2018,

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e). Section 402(e) of the Law states that an employee shall be ineligible for UC benefits for any week "[i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work." 43 P.S. § 802(e).

Claimant was involved in a verbal altercation with a co-worker in the workplace. *Id.* No. 2. After the altercation, Claimant stated to his manager, "They have guns, I have guns, if they want to take this off post I will." *Id.* No. 3. Later that day, Employer placed Claimant on paid administrative leave for making the statement to his manager and for threatening others in the workplace. *Id.* No. 4. On March 20, 2019, after conducting an investigation, Employer discharged Claimant for conduct unbecoming a federal employee and for making statements that caused anxiety and disruption in the workplace on November 29, 2018. *Id.* No. 5; *see* Record (R.) Item No. 3.

Claimant filed a claim for UC benefits, which the local UC Service Center denied. The Service Center found that Claimant was discharged for conduct unbecoming a federal employee and for making statements that caused anxiety and disruption in the workplace, which was a disregard of the standards of behavior that Employer had the right to expect of its employees. R. Item No. 4. Although Claimant asserted that he made the statements because "he was provoked and exercised his [F]irst [A]mendment [right] to stand up against a bully," the Service Center found that he did not have good cause for his conduct. *Id.* Therefore, the Service Center determined that Claimant was ineligible for UC benefits under Section 402(e) of the Law. *Id.*

Claimant appealed to the Referee, who held an evidentiary hearing on June 21, 2019. Claimant testified on his own behalf and presented the testimony of David Javitz, one of his co-workers at the time of his discharge. Employer presented the testimony of five witnesses: Cathy Fulk, Chief of Employer's Information Management Division and Claimant's direct supervisor; William Moody, Chief of Employer's Network Operations Branch; James Redline, Claimant's co-worker with

2

whom he had the November 29, 2018 altercation; William Grimaldi, an employee who witnessed the November 29, 2018 altercation; and Jeffrey Goldfarb, Employer's Lead Network Operations Technician.[2]

Ms. Fulk testified that she recommended that Claimant be removed from federal service based on Employer's investigation into the November 29, 2018 incident, including Claimant's statement to Mr. Moody, witness reports describing the altercation, the investigation by law enforcement officials, and "at least 14 statements" by other employees. Notes of Testimony (N.T.), 6/21/19, at 6. Ms. Fulk testified to the reasons for Claimant's discharge as follows:

> [Claimant] had made a statement that he knew they had guns, he had guns and he wanted to settle the confrontation that he had with the individuals outside and then he proceeded to say if they don't want to do it here and now, I will look their addresses up on Google Earth or Google Map[s] and I'll find out where they live. Then the other testimonies that were provided to me through the investigation revealed other confrontations that he had with employees that he worked with, and it was along the same lines, where he was aggressive, he was challenging, he was constantly looking for confrontations and wanting to pick fights with personnel.

*Id.* at 7.

Mr. Moody testified that on the afternoon of November 29, 2018, another employee came into his office and said, "It's happening again out on the floor," and Mr. Moody "knew he meant there was an argument, most likely involving [Claimant]." *Id.* at 24. Mr. Moody left his office and observed Claimant and Mr. Redline having a verbal dispute. After Mr. Moody returned to his office, Claimant

---

[2] Given the large number of witnesses who testified at the Referee's hearing and the length of the hearing transcript (75 pages), we will summarize only the portions of testimony relevant to the issues on appeal.

appeared and admitted to purposefully approaching Mr. Redline's desk and coughing on him. *Id.* Mr. Moody testified:

> As we're talking about the situation, [Claimant] gets to the point where he gets more upset. He says well, I have guns, they have guns, if they want to take this off post, I'm going to do that. I know how to use Google to find out where people live.

*Id.* at 24-25. Mr. Moody notified Ms. Fulk of Claimant's remark, and then they

> called security, got a[]hold of the desk sergeant, told him we had an incident. He said he'd have an officer come down momentarily. At which point I went back to my office and I'm not sure – it was roughly about 5 or 20 minutes, but in a short period of time, an officer showed up and I gave a . . . handwritten statement.

*Id.* at 26-27.

With regard to Claimant's overall behavior in the workplace, Mr. Moody testified as follows:

> [Employer's Counsel:] . . . Regarding [Claimant's] conduct in the months prior to the incident, did you notice any effect on the workplace based on [Claimant's] conduct?
>
> [Mr. Moody:] During that timeframe and even before that timeframe, yes.
>
> [Employer's Counsel:] What's that?
>
> [Mr. Moody:] Just, you know, negative, hostile environment where people as well as myself were cautious about what we say around [Claimant] and the belief that someone there would become violent, if there was an active shooter, myself included, I've always felt [Claimant] would be the source of that violence.
>
> [Employer's Counsel:] Did his conduct make you fear for your safety at work?

4

[Mr. Moody:] Yes, sir.

[Employer's Counsel:] How about after work?

[Mr. Moody:] After work, yes. Especially after this incident, I made certain to inform my family members to be cautious when they come around the house, and if approached by a certain individual to not engage.

*Id.* at 30.

Mr. Redline testified that on November 29, 2018, he had no contact with Claimant until the altercation. Mr. Redline testified that he gave a statement to security immediately after the incident, in which he stated:

[A]t approximately [1:45 p.m.] on 29 November 18[,] I sat at my desk . . . . Approximately 30 seconds to [one] minute later, [Claimant] left his desk approximately 30 feet from where I was seated and approached the backside of my co[-]worker[/]cubemate, [Gavin] Walker[,] seated to my left. [Claimant] proceeded to lean over the center desk between myself and [Mr. Walker] and with an open and uncovered mouth coughed. At this point I fully looked up towards him, at which point [Claimant] started into a profanity[-]laced tirade, saying fuck you while pointing at me and fanning his arms as if . . . to hold a posture to give someone a large hug. [Claimant's] aggressive demeanor only escalated further to threats of physical altercation by inviting me outside several times while continuing to yell expletives. . . . I stood from my chair without taking any steps from my area to ensure a non[-]aggressive posture and proceeded to ask [Claimant] if I'm clear on what I'm hearing, that he wants to go outside for a physical altercation. [Claimant] further yelled fuck you, motherfucker, and extended his invitation to further go outside by inviting me to meet him off base anytime, anywhere, that he will be there.

*Id.* at 36-37 & Ex. E-6.

Mr. Grimaldi testified that he witnessed the altercation between Claimant and Mr. Redline on November 29, 2018. Mr. Grimaldi confirmed that Claimant

approached Mr. Redline, coughed at him, used profanity, threatened him physically, and asked him if he wanted to go outside to settle the matter. *Id.* at 43. He further testified that Mr. Redline did not use profanity during his interaction with Claimant. *Id.* at 47.

Claimant testified that prior to the November 29, 2018 incident, he filed several complaints with Employer reporting harassment by his co-workers, including Mr. Grimaldi and Mr. Redline. Claimant testified after filing the complaint about Mr. Grimaldi, Mr. Grimaldi stopped harassing him. *Id.* at 56-57. However, with regard to Mr. Redline, Claimant filed a complaint on November 8, 2018, but Employer did nothing. *Id.* at 57.

Claimant testified that on the afternoon of November 29, 2018, he was preparing for a one-month leave of absence from work beginning the next day. *Id.* at 57. According to Claimant, around 2:00 or 2:15 p.m., Mr. Redline walked by Claimant and specifically came to his side of the aisle. *Id.* Claimant testified that the aisle was 20 feet wide, so there was "no reason for [Mr. Redline] to come to [his] side of the aisle at all." *Id.* Claimant then testified as to what happened next:

> [Mr. Redline] walked by my desk and coughed. Come on, man. I was really, really, you know, annoyed by that. I walked by his desk and did what I said I was going to do in my email.[3] I coughed, and then I

---

[3] The "email" Claimant referenced is a November 8, 2018 email to Mr. Moody in which Claimant complained that Mr. Redline had harassed him by intentionally coughing on him. *See* N.T., 6/21/19, Ex. C-3. In that email, Claimant stated to Employer:

> Today, when I asked [Mr. Redline] politely not to cough when walking by my desk, his response was "I can cough wherever I want[."] Please advise him to stop the harassment and the hostility. I don't like people spreading their germs around me for health reason[s]. I take good care of my body and health and I do not want to get sick.

> If [Mr. Redline] refuses to respect my right to work free of harassment, I will treat him the same way. I really hate to get down to his level by going over to his desk

walked away. Then he got out of his chair and said don't come around here coughing on me. I said I was not coughing on you, I was walking by your desk, there's no sign that says I cannot be around your desk.

. . . .

I walked away and then [Mr.] Redline said something. He said I'm not afraid of you. Then I turned around. By then I was halfway back to my desk. I turned around and said well, we can settle this off post. He looked at me, he said shut the F up, are you kidding me, and then he chuckled. Are you serious? That's what he said. We exchanged more words. Then [Mr.] Walker, . . . the guy sitting next to [Mr. Redline,] jumped in and said I don't appreciate that you are coughing in my area, and I asked him to stay out of it because it was between me and [Mr.] Redline, and that was the only conversation I had with [Mr.] Walker. Then I was at my desk and then [Mr.] Redline was at his desk. We were 15 feet apart. We were still exchanging – we were still conversing. Then I noticed [Mr.] Moody behind me. I stopped conversing with [Mr.] Redline.

*Id.* at 57-58.

Claimant testified after the confrontation with Mr. Redline, he met with Mr. Moody privately in Mr. Moody's office. *Id.* at 58. Claimant asked Mr. Moody if he could "talk to [his] guys again and ask them to stop harassing me, because I was really getting annoyed. I said if you don't stop it at your level, I will escalate the incident to the higher up[s]." *Id.* Claimant, however, denied making any statements to Mr. Moody about having guns or being able to Google his co-workers to determine where they live. *Id.*

---

and cough[ing] on him, but this work place harassment must stop. I will let you resolve this at your level. If he doesn't stop, I will elevate it to the Deputy Director.

If [Mr. Redline] coughs near me again, I will go cough near him and see if he will like it. . . .

*Id.*

7

On cross-examination, Claimant testified that when Mr. Redline told him to "shut the fuck up," he responded with "fuck you." *Id.* at 62. Claimant further explained that when he said to Mr. Redline that they can "handle this matter off post," he was not suggesting that they should fight; rather, he "just wanted to talk to him off post, maybe [they] could have a beer or something" and "talk it out." *Id.* at 63.

Following the hearing, the Referee affirmed the Service Center's decision to deny UC benefits. The Referee acknowledged the conflicting evidence presented by the parties and expressly resolved the conflicts in the evidence in Employer's favor. The Referee concluded as follows:

> [E]mployer['s] witness testified that on March 20, 2019, [E]mployer discharged [C]laimant for making a threatening statement to a manager regarding other workers. Furthermore, on November 29, 2018, [C]laimant said, "They have guns, I have guns, if they want to take this off post I will." As such, the Referee concludes that the Employer has met its burden of proof in establishing that the Claimant's discharge from employment was for reasons which rise to the level of willful misconduct in connection with the work and benefits are denied in accordance with Section 402(e) of the Law.

Ref.'s Order, 6/24/19, at 2.

Claimant appealed to the Board, which adopted and incorporated the Referee's findings of fact and conclusions of law. In its decision, the Board noted that in his appeal to the Board, Claimant attempted to introduce additional documentary evidence that he claimed was unavailable to him at the time of the hearing before the Referee. The Board declined to consider such evidence, however, because "[m]ost of these documents predate[d] the hearing and [C]laimant [did] not

8

establish[] what diligence he exercised to obtain them before [the present appeal]."

Bd.'s Order, 10/7/19, at 1.[4]

With regard to the merits of the appeal, the Board made the following additional findings and conclusions:

[C]laimant argues that [E]mployer's [disciplinary] policy did not justify discharge for the first offense. [E]mployer's policy, however, provides [the following] caveat:

A Table of Penalties, as stated previously, contains a suggested range of penalties. It is a guide to discipline, not a rigid standard. Deviations are allowable for a variety of reasons. For example, when an employee is being charged with multiple offenses at the same time, it may be appropriate to exceed the maximum suggested penalty for all of the individual offenses. Again, when an employee has repeatedly committed the same offense, even though the employee is being charged with the offense for the first time, it may be appropriate to exceed the maximum suggested penalty. When the offenses the employee committed is especially serious, compared to normal degree of the stated offense, there may be a basis for exceeding the maximum suggested penalty.

[C]laimant had a history of discipline, albeit for unrelated offenses. This does not mean this was [C]laimant's first offense of this nature; he was accused by his co[-]workers of similar past conduct, though it had never been reported. This was also [a] severe offense. Therefore, [E]mployer was justified in exceeding [its] guideline to discharge [C]laimant for his conduct. Conversely, [C]laimant has not credibly justified his conduct.

---

[4] Because the Board declined to consider Claimant's supplemental evidence, these documents are not part of the certified record on appeal.

9

*Id.* at 1-2. Therefore, the Board affirmed the Referee's decision. Claimant now petitions this Court for review.[5]

### Analysis

On appeal, Claimant asserts that the Board abused its discretion in failing to consider the additional evidence he submitted with his appeal, which he claims was "exculpatory" and contradicted the testimony of Employer's witnesses at the hearing before the Referee. Claimant also asserts that Employer failed to prove that he committed willful misconduct under Section 402(e) of the Law.[6]

### 1. Board's Failure to Consider Additional Evidence

Claimant asserts that the Board abused its discretion in refusing to consider the additional documentary evidence he submitted with his appeal to the Board, including a police report from the criminal investigation into Claimant's allegedly threatening statements at work.[7] According to Claimant, "[t]wo law enforcement officers conducted an investigation and [concluded that the November 29, 2018]

---

[5] Our scope of review is limited to determining whether the necessary factual findings are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

[6] In his *pro se* Petition for Review, Claimant also asserts that: (1) Employer failed to prove that he was aware of its policy prohibiting violence in the workplace and that he violated that policy; and (2) Employer failed to comply with its progressive discipline policy for behavioral offenses by discharging Claimant for a first offense. However, because Claimant has abandoned these issues in his appellate brief, we will not address them.

[7] Although Claimant avers that he received the police report on June 27, 2019, Claimant's Initial Br. at 2, he did not seek to introduce this additional evidence with either his Petition for Appeal (filed July 1, 2019) or his brief filed with the Board (filed August 2, 2019). *See* R. Item Nos. 10, 13. Claimant submitted the additional evidence via a supplemental filing with the Board on August 28, 2019. *See* R. Item No. 16.

10

'incident didn't meet the elements of a crime this case will be closed' and 'the elements were not met for the crime of harassment.'" Pet. for Review at 2.

On appeal, Claimant argues for the first time that he was unable to obtain the additional evidence before the hearing because Employer refused to turn it over to him in violation of his constitutional rights, citing *Brady v. Maryland*, 373 U.S. 83 (1963).[8]  However, Claimant did not argue a *Brady* violation in his appeal to the Board, so this claim is waived.  *See Chapman v. Unemployment Comp. Bd. of Review*, 20 A.3d 603, 611 (Pa. Cmwlth. 2011) (holding that an allegation of error that was not raised before the Board "has been waived for purposes of appeal[ and] will not be addressed for the first time by this Court"); Pa. R.A.P. 1551(a). Moreover, "[t]he legal requirement of a party to turn over exculpatory evidence, commonly referred to as the '*Brady* Doctrine,' is inapplicable to [UC proceedings], as this doctrine is only applied in criminal, rather than civil, proceedings." *Medlen v. Unemployment Comp. Bd. of Review* (Pa. Cmwlth., No. 2667 C.D. 2015, filed September 15, 2016), slip op. at 6 n.4.[9]

Pursuant to its regulations, the Board "cannot review evidence that was not submitted to the Referee, unless it directs the taking of additional evidence." *Umedman v. Unemployment Comp. Bd. of Review*, 52 A.3d 558, 564 (Pa. Cmwlth. 2012) (citing 34 Pa. Code § 101.106).  In declining to consider Claimant's supplemental evidence, the Board explained that "[m]ost of these documents

---

[8] In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violated due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.

[9] Under Commonwealth Court Internal Operating Procedure 414(a), 210 Pa. Code § 69.414(a), we may cite an unreported panel decision of this Court, issued after January 15, 2008, for its persuasive value.

11

predate[d] the hearing and [C]laimant [did] not establish[] what diligence he exercised to obtain them before [the present appeal]." Bd.'s Order, 10/7/19, at 1. In fact, Claimant offered no explanation in his multiple filings with the Board as to why he did not obtain this supplemental evidence in a timely manner. *See* R. Item Nos. 10, 13, 15.

Furthermore, the Board's regulation at 34 Pa. Code § 101.104(c)(1) states, in relevant part, that "further appeal shall be allowed and *additional evidence required* . . . [w]henever the further appeal involves *a material point* on which the record below is silent or incomplete or appears to be erroneous." Whether Claimant was criminally charged for his conduct in the workplace is irrelevant to the issue of whether he committed disqualifying willful misconduct under the Law.[10] The Board found that Claimant was discharged for making the threatening statement that he would settle the matter off post with guns on November 29, 2018. Bd.'s F.F. Nos. 3, 5. Because Claimant does not specifically challenge the Board's findings regarding the basis for his discharge, they are conclusive on appeal. *Munski v. Unemployment Comp. Bd. of Review*, 29 A.3d 133, 137 (Pa. Cmwlth. 2011).

Claimant also argues for the first time on appeal that Employer violated his due process rights by not providing him a constitutionally proper hearing as required by *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).[11] In addition to this issue being waived for Claimant's failure to raise it before the Board, *see*

---

[10] At the hearing, Claimant testified that he was not charged with a crime in connection with the November 29, 2018 incident. N.T., 6/21/19, at 59-60. Thus, contrary to Claimant's contention on appeal, the Board was aware of the result of the criminal investigation into his conduct.

[11] "A *Loudermill* hearing is a pre-termination hearing given to a public employee that is required by due process . . . ." *Ray v. Brookville Area Sch. Dist.*, 19 A.3d 29, 31 n.2 (Pa. Cmwlth. 2011).

*Chapman*, 20 A.3d at 611, Claimant's "assertion that [he received an] improper *Loudermill* hearing has [no] bearing on his receipt of [UC] benefits," *Yost v. Unemployment Comp. Bd. of Review*, 42 A.3d 1158, 1162 (Pa. Cmwlth. 2012).

Therefore, we conclude that the Board did not abuse its discretion in refusing to consider Claimant's additional evidence submitted with his appeal to the Board.[12]

## 2. Willful Misconduct

Claimant does not specifically challenge the Board's willful misconduct determination in the body of his appellate brief. However, in his Petition for Review, he avers that Employer failed to prove that he committed willful misconduct, and he also references that issue in the Summary of Argument section of his brief. Therefore, we will address this issue.

Our Court has defined "willful misconduct" as a wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rules, a disregard of the standards of behavior that the employer has a right to expect of its employees, or negligence indicating an intentional disregard of the employer's interests or of the employee's duties and obligations. *Miller v. Unemployment Comp. Bd. of Review*, 83 A.3d 484, 486-87 (Pa. Cmwlth. 2014). The employer bears the burden of proving

---

[12] In his reply brief filed with this Court, Claimant again asserts that the Referee and the Board "did not have the 'entire record'" because "[t]he record was missing the law enforcement report of an investigation which is contrary to [E]mployer's witnesses' statements." Claimant's Reply Br. at 2. Claimant also asserts that he recently filed a wrongful termination lawsuit against Employer, claiming that "[E]mployer used the November 29, 2018 incident as a pretext to mask disability discrimination and other prohibited personnel practices," *id.*, and attaches documents from that lawsuit to his reply brief. However, we cannot and will not consider extra-record evidence on appeal that was not part of the record before the Board. *See Pa. Tpk. Comm'n v. Unemployment Comp. Bd. of Review*, 991 A.2d 971, 974 (Pa. Cmwlth. 2009) ("This Court may not consider any evidence that is not part of the certified record on appeal."); *Croft v. Unemployment Comp. Bd. of Review*, 662 A.2d 24, 28 (Pa. Cmwlth. 1995) ("This Court may not consider auxiliary information appended to a brief that is not part of the certified record on appeal . . . .").

that the claimant committed willful misconduct. *Allen v. Unemployment Comp. Bd. of Review*, 189 A.3d 1128, 1134 (Pa. Cmwlth. 2018). Once the employer satisfies its burden, the burden shifts to the claimant to establish good cause, i.e., that his actions were justified and reasonable under the circumstances. *Id.*

Our Court has held that "a threat of violence or harm to a supervisor or co-worker disregards the standards of behavior an employer can rightfully expect of an employee." *Cummins v. Unemployment Comp. Bd. of Review*, 207 A.3d 990, 996 (Pa. Cmwlth. 2019); *see Johns v. Unemployment Comp. Bd. of Review*, 87 A.3d 1006, 1010 (Pa. Cmwlth. 2014) ("It is well-settled that threats of harm toward a co-worker or supervisor constitute willful misconduct under the Law."); *Sheets v. Unemployment Comp. Bd. of Review*, 708 A.2d 884, 884 (Pa. Cmwlth. 1998) (holding that the claimant's threat that he "may as well shoot" his co-workers was willful misconduct). Further, "[t]hreats of harm, even if communicated only to a third party, 'create[] discord and interrupt[] the employer's operation.'" *Johns*, 87 A.3d at 1013 (quoting *Sheets*, 708 A.2d at 885).

The Board found that, after engaging in a verbal altercation with Mr. Redline in the workplace, Claimant stated to his manager, "They have guns, I have guns, if they want to take this off post I will." Bd.'s F.F. Nos. 2, 3. Ms. Fulk credibly testified that Claimant's behavior was "an extreme act of [threatened] violence that required immediate measures. There was safety at risk with the employees when those statements were being made. When someone says they have guns, I have guns, that definitely warrants an immediate result." N.T., 6/21/19, at 14. The Board disbelieved Claimant's testimony that when he said he wanted to "settle this off post," he meant that he wanted have a conversation with Mr. Redline after work over a beer. Bd.'s Order, 10/7/19, at 1; *see Guthrie v. Unemployment Comp. Bd. of*

14

*Review*, 738 A.2d 518, 521 (Pa. Cmwlth. 1999) (stating that the Board is the ultimate factfinder in UC cases and is empowered to resolve conflicts in evidence, determine the weight to be accorded the evidence, and determine the credibility of witnesses). We conclude, based on the credible evidence of record, that Claimant's statement that he would use guns to settle the matter off post with his co-workers was a disregard of the standards of behavior that Employer had a right to expect of its employees.

Because Employer met its burden of proving willful misconduct, the burden shifted to Claimant to establish good cause. At the hearing, Claimant testified that he was repeatedly harassed by his co-workers and that Mr. Redline provoked him by intentionally coughing near Claimant's desk three weeks before the incident and on the day of the incident. However, Claimant admitted on the record that, with regard to his purposeful coughing on Mr. Redline, "[i]t was not appropriate for me to do that" and "two wrongs doesn't [sic] make a right." N.T., 6/21/19, at 67. Claimant also testified that he said "settle this off post . . . because that was the only words [sic] [he] could think of at the time." *Id.* at 66. Resolving the conflicts in the evidence in Employer's favor, the Board determined that Claimant did not credibly justify his conduct. Bd.'s Order, 10/7/19, at 1.

The record established that, after a verbal altercation and exchange of profanities with Mr. Redline, Claimant made a threatening remark to his manager about his co-workers, stating, "I have guns, I know they have guns, if they want to take this off post I will." Bd.'s F.F. Nos. 2, 3. Claimant did not establish good cause for his conduct. Therefore, we conclude that Employer met its burden of proving that Claimant committed disqualifying willful misconduct under Section 402(e) of the Law.

15

## Conclusion

Accordingly, we affirm the Board's Order.

_____

ELLEN CEISLER, Judge

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jay Kruise,       :
    Petitioner   :
           :
  v.        : No. 1715 C.D. 2019
           :
Unemployment Compensation  :
Board of Review,     :
    Respondent  :

# **O R D E R**

AND NOW, this 29th day of July, 2020, the Order of the Unemployment Compensation Board of Review, dated October 7, 2019, is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge